**United States Bankruptcy Court**
**Eastern District of Pennsylvania**

In re:

    Victoria's Kitchen LLC,

             Debtor.

Case No. 25-13380-djb

Chapter 11 (Subchapter V)

**Declaration of Victoria A. Turner Tyson in Support of the Debtor's**
**Third Amended Chapter 11 Subchapter V Plan of Reorganization**

I, Victoria A. Turner Tyson, hereby declare as follows:

1.      I am the Managing Member of Victoria's Kitchen LLC, the debtor in this case (the "Debtor"). I founded the Debtor's business, I own it, and I have managed its day-to-day operations at all times, including throughout this case. I submit this declaration in support of confirmation of the Debtor's Third Amended Chapter 11 Subchapter V Plan of Reorganization, filed June 18, 2026 (the "Plan"), and in lieu of direct testimony at the confirmation hearing scheduled for July 21, 2026.

2.      I make this declaration from my personal knowledge of the Debtor's business and operations and from my review of the Debtor's books and records. The Debtor's books and records are made at or near the time of the events they record, by me or by persons with knowledge of those events, and are kept in the course of the Debtor's regularly conducted business activity; making and keeping those records is a regular practice of the business, and I am one of the custodians of them. If called as a witness, I could and would testify competently to the matters stated below.

3.      The Debtor is a limited liability company organized under Pennsylvania law. Since 2014, it has owned and operated a restaurant in Philadelphia under the name "Victoria's Kitchen."

The Debtor earns its revenue primarily from the sale of food for off-premises consumption, together with income from catering services.

4.      The Debtor filed this case on August 26, 2025. I made the decision to file, and I proposed the Plan, so that the restaurant could continue operating, its employees could keep their jobs, and its creditors could be paid from the income of the business. I provided the information contained in the Plan and its exhibits to the Debtor's counsel, and the factual statements in the Plan are accurate and truly reflect the state of the Debtor's affairs to my knowledge.

5.      After confirmation, I will continue to manage the Debtor as its Managing Member. I receive compensation from the Debtor only in the ordinary course of its business for the services I perform, and the Plan does not change my compensation. No other insider of the Debtor will receive any compensation under the Plan. The Debtor has not issued, and does not intend to issue, nonvoting equity securities.

6.      I participated in preparing the liquidation analysis attached to the Plan as Exhibit A. The asset values in Exhibit A come from the Debtor's books and records and from my own estimates of what the Debtor's property would bring if sold, which I base on my familiarity with each asset's age, condition, and original cost; cash and cash equivalents of $12,186; deposits and prepayments of $2,500; accounts receivable of $220,000; inventory of $13,000; office furniture, fixtures, and equipment of $6,000; machinery, equipment, and vehicles of $117,795; and intangibles of $3,000, for a total of $374,481.

7.      The Debtor owes substantial tax debts to the Pennsylvania Department of Revenue and the Commonwealth of Pennsylvania UCTS, and owes a loan to the U.S. Small Business

2

Administration, each secured by the Debtor's property. Those debts far exceed the $374,481 value of the Debtor's assets.

8.      Based on the Debtor's monthly records, the Debtor's gross receipts have averaged approximately $208,000 per month since this case was filed, and its monthly expenses over the same period have been approximately the same amount. The largest reason is food costs, which rose sharply in recent years while the Debtor's menu prices stayed where they were. Most entrees on the Debtor's menu were priced at $22, and the Debtor had not adjusted its menu prices for approximately three years before the Plan was filed.

9.      The Debtor will adjust its menu prices, by as much as 25%, to bring them in line with its food costs. Based on my twelve years serving the Debtor's customers, the strength of the Debtor's reputation and customer following, and the fact that even at the adjusted prices the Debtor's food will cost less than comparable food at competing restaurants, I do not expect the price adjustments to cause a substantial loss of business.

10.      I participated in preparing the cash flow projection attached to the Plan as Exhibit B. The projection is built from the Debtor's actual receipts and actual expenses as recorded in its books and records, adjusted for the planned menu price adjustments. It estimates that the price adjustments will raise monthly gross receipts by 14%, to $237,120, and that after payment of all of the restaurant's ordinary operating expenses (including, but not limited to food, payroll and payroll taxes, rent, catering subcontractors, paper products, sales tax, utilities, insurance, vehicle and office expenses, marketing, accounting, delivery and card processing fees), and the fees of the Debtor's attorney and the Subchapter V Trustee, the Debtor will have approximately $34,462 in income remaining each month.

11.     I have reviewed the payments the Plan requires the Debtor to make to holders of priority and secured claims. The total of those monthly payments is less than the $34,462 in monthly income the Debtor projects will remain after operating expenses, with the balance available for distributions to general unsecured creditors as the Plan provides.

12.     On the Effective Date, the Debtor will assume the leases and contracts listed in Exhibit D to the Plan, including the leases of its business premises at 2001 East Tulpehocken Street, 7304 Ogontz Avenue, and 5070 Parkside Avenue in Philadelphia, its insurance, and its food services contract with the Philadelphia Housing Authority. The Debtor needs each of them to keep operating, and it intends to perform them.

13.     All fees owed to the Clerk of Court and the Office of the United States Trustee that are due on or before the Effective Date have been paid or will be paid on the Effective Date from funds on hand.

14.     Based on my twelve years operating this business, the receipts it has actually generated during this case, the planned menu price adjustments, and the projections in Exhibit B, I believe the Debtor will be able to pay its operating expenses and make every payment required by the Plan as it comes due, and that the Debtor will continue operating after confirmation rather than face liquidation or another reorganization.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information

Dated: July 17, 2026                         /s/ Victoria A. Turner Tyson
                                             Victoria A. Turner Tyson

4